## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DENICE A. WEBBER,                  )
                                   )
          Plaintiff,               )
                                   )
v.                                 )          Case No. 15-1285-GEB
                                   )
MID-KANSAS PEDIATRIC               )
ASSOCIATES, P.A.,                  )
                                   )
          Defendant.               )
_____)

## <u>MEMORANDUM AND ORDER</u>

Plaintiff brings this action against her former employer alleging her termination was unlawful, based upon three claims:  1) discrimination on the basis of her age; 2) discrimination on the basis of her disability; and 3) in retaliation for her complaints regarding her treatment.  This matter is now before the Court on Defendant's Motion for Summary Judgment (**ECF No. 32**).  The Court finds jurisdiction proper under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(4) with supplemental jurisdiction under 28 U.S.C. § 1367.  After review of Defendant's motion and memorandum (ECF No. 33), Plaintiff's Response in opposition (ECF No. 39); Defendant's Reply (ECF No. 44), and hearing arguments of counsel at the September 19, 2016 in-person hearing, the Court **GRANTS** Defendant's motion as set forth below.

## I.   Factual Background[1]

Plaintiff Denice A. Webber was employed by defendant Mid-Kansas Pediatric Associates, P.A. ("MKPA"), a Kansas professional association conducting business as a pediatric medical clinic in Sedgwick County, Kansas, from October 4, 2007 until her termination on September 16, 2014.   MKPA is comprised of three Kansas offices:   an east Wichita office, a west Wichita office, and a Derby[2] office.   MKPA hired Webber in 2007 as a receptionist and, throughout her employment, she was located at MKPA's west office.   Michelle McKissick acted as office manager of the west location during Webber's employment.   On May, 1, 2008, Webber was promoted to a position in the billing department that the parties describe as "Billing Leader" and/or "Billing Specialist." Amy Gilchrist, MKPA's Practice Administrator, promoted Webber to the billing position, but was primarily located in the east clinic location.   Promotion records, signed by Gilchrist, indicate Webber was promoted due to her professionalism, talent, hard work, and judgment.   Throughout her employment, MKPA relied upon Webber's proficiency in handling its billing matters; however, Webber's difficulties at maintaining positive work relationships ultimately led to the disintegration of her job.

### A.   Billing

From her promotion in 2008 until 2012, Webber acted as MKPA's sole billing specialist.   In 2012, after MKPA's practice grew and the resulting workload increased,

---

[1] The material facts set forth below are either uncontroverted for purposes of summary judgment, or are set forth in the light most favorable to Plaintiff.   Where necessary, any factual disputes will be noted.

[2] Derby, Kansas is a suburb located to the southeast of the city of Wichita.

Webber suggested the hiring of an additional billing specialist.  Webber proposed then-receptionist Stacy Halls, who was under the age of 40, as a potential candidate.  Halls was the only one of the current clinic employees Webber considered suggesting for the position, and MKPA hired Halls to share the billing duties.

<u>Billing Duties – Before Webber's Illness</u>

According to a job description written by MKPA for the billing position, Webber was required to gather charge information,[3] code services, enter information into a database, complete the billing process, and distribute billing information.  The position also required her to perform other responsibilities, such as following HIPAA guidelines for maintaining patient confidentiality and other duties as assigned.  Contained in the description, and admitted by Webber, is the additional performance requirement that she would establish and maintain effective working relationships with other employees, the medical providers, and the public.

One of the listed duties of a billing specialist was to code diagnoses and procedures from information provided by physicians, and to assist with coding error resolution.  If a ticket or lab order bill arrived in the billing department without an assigned diagnosis code, the billing department identified the proper code, according to the procedure or service provided, and would input the correct billing code.  During Webber's employment, MKPA used the ICD-9 diagnosis coding manual to determine billing codes, but was preparing to implement the ICD-10 system, which Webber

---

[3] "Charging out tickets" is a process of data entry, where the biller enters charges from the tickets (generated when a physician sees a patient) into MKPA's computer system so the services can be either billed to insurance or charged to the patient.

understood would complicate billing by adding thousands of new billing codes.   The record is unclear regarding when MKPA originally planned to implement the new billing system, but it appears MKPA planned to do so in approximately early to mid-2014. However, the conversion was delayed.

After Halls' move to billing, Webber shared billing duties with Halls.   When helping to prepare an office manual, Webber described her responsibilities in more detail, noting among other duties, she entered charge tickets for the east and Derby offices into the computer system daily, while Halls handled the west office tickets.   Both billers handled denied insurance claims, although initially Halls handled more with Webber assisting as time allowed.   There was no specific delineation of which biller took on which duties.

### Webber's Illness

In late January 2014, Webber was diagnosed with cancer.  She underwent surgery and, due to her surgery, she was not cleared by her physician to return to work until February 24, 2014.  After her return, Webber worked on a part-time basis to recover from surgery, undergo chemotherapy, and attend related medical appointments.  Her course of chemotherapy continued through June of 2014.  Webber was released by her physician back to full-time work on August 4, 2014 and now reports her cancer is in remission.

The parties agree that, due to her cancer diagnosis and treatment, Webber was an individual with a disability, as defined by the Americans with Disabilities Act of 1990, 42 U.S.C. § 12102(1), and the Kansas Act Against Discrimination, K.S.A. § 44-1002(j), (l). MKPA did not deny Webber any accommodation for her disability.

<u>Billing Duties – After Webber's Illness</u>

During Webber's absence from work, Halls took on all billing duties previously shared by the two women.  Halls maintained the daily charge work but was unable to keep up with resubmitting denied insurance claims, some of which accumulated during Webber's absence.  Webber does not dispute Halls' assumption of all billing duties was a natural consequence of her absence.  However, Webber's job duties changed upon her return to work in March 2014.

While Webber worked part-time from approximately March to August 1, 2014, she was able to set her own work hours and come and go as needed.  MKPA asked her to first work only on resubmitting the denied claims, and Webber spent all of her time working on those claims for approximately the first month she was back to work.  Later, Webber began inputting the Derby office charge tickets, but Halls continued to process the daily tickets from both the east and west offices.  Webber admits the work she was given while working part-time was work that, if she needed to leave and the work was left undone, it would not create a significant disruption to MKPA's business.  After she returned to work full-time, she continued processing the Derby charge tickets, processing denied insurance claims, preparing insurance reports, and she was assigned the new project of bringing MKPA into compliance with HIPAA.

B.    **Working Relationships**

According to the sworn declarations and deposition testimony of several MKPA employees, working with Webber was extremely stressful.  Webber's coworkers contend they had to endure Webber's negative behavior toward them for several years.

5

According to the employees, Webber was disruptive, confrontational, rude, and overly critical of them. Many claimed they had never experienced such a difficult working relationship, and declared the work environment improved when Webber's employment ended. Gilchrist testified some employees considered leaving MKPA because of the environment created by Webber. As an example, Gilchrist described Webber screaming at and intimidating the front desk staff if they mistakenly failed to get proper insurance information from a patient, which would leave the front desk staff in tears. Gilchrist testified Webber was confronted frequently both before and after her illness regarding her approach to other clinic staff, and instructed not to confront coworkers with billing questions but to go to Gilchrist or McKissick first. Webber does not specifically refute the complaints of her former coworkers, but points to her otherwise positive work history and lack of formal reprimands during her 7-year employment.

Gilchrist testified MKPA's physicians had communicated to her their disapproval of the disruption among staff in the west office, stemming from the way Webber treated her coworkers. She declared the physicians discussed terminating Webber's employment in late 2013, but decided to wait—first until after the holidays, but in light of her cancer diagnosis, MKPA did not want her to suffer additional hardship.

Despite MKPA's complaints of Webber's workplace bullying, only in one instance was Webber formally reprimanded regarding her interaction with coworkers. On March 25, 2011 Webber admits she was disciplined after bringing to Halls' attention a mistake on a fee ticket, and understood Halls may have felt Webber overstepped her boundaries. Despite the lack of other written warnings, Webber admits McKissick

discussed her work relationships with her on other occasions.  Webber did not dispute she referred to her co-workers as "idiots" and complained to coworkers about McKissick.

### Relationship between Plaintiff and McKissick

In addition to the complaints from other coworkers, Webber's relationship with McKissick was particularly strained.   Webber testified that, on one occasion after returning to work, McKissick accused her of having "chemobrain."  McKissick denies using the word, and testified Webber actually mentioned it.  Regardless of who said "chemobrain," Webber states McKissick mentioned it once and neither brought the issue up again.   According to Webber, McKissick's use of the word "chemobrain" was insulting and insinuated that she was not remembering things during her illness.  However, Webber acknowledged the chemotherapy caused her to become fatigued and negatively impacted her concentration.

In addition to the "chemobrain" incident, Webber claims McKissick asked her repeatedly whether or when she planned to retire.  Although Webber could not pinpoint when the retirement questions were asked, and may have first occurred prior to her illness, Webber remembers the questions continued after her illness.

As another example of Webber's disregard of authority, MKPA describes an incident in approximately late May or June 2014, when Webber used a key to enter McKissick's locked office without permission.  McKissick admitted both Webber and Halls had access to a key to her office so they could enter if she were unavailable; however, McKissick expected neither woman to use the key without contacting her first. Webber explained she entered the office to look for a key to a shred bin, but did not

specifically refute her coworker's claim she had access to another shred bin key in her own office.  Webber was not disciplined for the incident and did not recall it being brought to her attention prior to her termination.

### C.  June 3, 2014 Meeting

By early June 2014, Gilchrist heard multiple rumors about Webber's complaints to coworkers regarding her treatment following her surgery.  On June 3, 2014, Gilchrist met with Webber to address the rumors.  Gilchrist confronted Webber about hearing the following complaints:  she was being mistreated due to her illness; MKPA was going to fire her because of an increase in insurance premiums; her job duties were being taken away; and Webber was planning to file a legal claim against MKPA.  Webber denied making the complaints, but did express concern to Gilchrist about her job duties being changed or taken away because of her illness.  Webber did not mention the ADEA or ADA or request any accommodation.  Gilchrist told Webber her health was Webber's first priority and her job was not in jeopardy.

Following the meeting, Gilchrist sent an email to MKPA's board of directors outlining her discussions with Webber.  In the email, Gilchrist recounted what she believed were MKPA's efforts to reduce Webber's stress by giving her non-urgent work and the freedom to come and go as her health allowed, and although she expected Webber to be grateful, she was not.  Gilchrist informed the board that Halls' assumption of the billing duties caused the "error rate to drop immensely" and, according to legal counsel, Gilchrist had "every right to restructure [Webber]'s position" and if she "wanted to give her an Elmo coloring book with crayons to work on but kept her pay and benefits

the same," it would be legally acceptable and MKPA was being "very fair" to Webber. Gilchrist also noted with the postponement of ICD-10, the billing department was "going to have to change things (restructure)."

### D.     Webber's Supervision and Pay

The billing specialist job description notes the position is supervised by MKPA's Administrator, Gilchrist.   Gilchrist not only promoted Webber to billing in 2008, but signed at least one of Webber's subsequent pay increase and administered Webber's most recent performance review.

The parties dispute whether McKissick also acted as Webber's supervisor. Webber believes in the June 3, 2014 meeting she was informed by Gilchrist that McKissick would become her direct supervisor, although Gilchrist does not recall making the comment.  However, it is undisputed that McKissick signed two written reprimands— including the one dated March 25, 2011—as Webber's "supervisor/manager." Additionally, Webber testified that, although she considered Gilchrist to be her supervisor, she understood she would sometimes report to McKissick when Gilchrist was not at the west office.

During her employment as Billing Leader, Webber received regular wage increases, from $14.75 per hour in 2008 to her final increase of $16.91 per hour in 2014. Each MKPA employee receives a Christmas gift from the physicians, calculated at the base amount of $150 plus $20 for each year they have been employed.  Following this schedule, Webber's annual bonus increased each year, from $150.00 in 2008 to $270.00

in 2012. Webber also received a performance bonus, or "market adjustment" to her wages, of $840.96 in November 2012.

### E.   <u>2014 Billing Disputes</u>

Although Webber's proficiency with billing did not seem to be a source of contention earlier in her employment, MKPA cites two instances of improper billing which occurred after Webber's illness and contributed to her termination. But, in only one of those instances did Webber receive a written warning.

The first billing issue occurred in May 2014, when a patient telephoned MKPA and spoke with Webber. His son had a hearing test called an "audiogram," for which his insurance company denied payment. Webber's note in the patient's account reads:

> Father called, said he has spoken to ins[urance] and they say routine exam should be covered. Advised that is basically what we charged but there is some changes I can make that are basically [the] same. We will give it a try. Made changes and filed corrected claim.

Webber changed the billing code to reflect an "audiopath" so that the patient's insurance company would cover the exam. She did not seek approval for the change from Gilchrist or McKissick, and admits being instructed previously not to change a code without consulting either the provider or a supervisor. On May 23, 2014, Webber was given a written Warning Report, signed by McKissick, noting the code change and warning that "this can cause fraudulent issues."

Webber testified to ongoing confusion regarding which code to use for the specific type of hearing test. She believed the two codes were interchangeable after discussing the differences between the codes with a medical assistant after the patient's father called.

Emails between Gilchrist and clinic physicians reveal the medical providers were unsure regarding proper coding of the two types of hearing tests and confirm Webber spoke with a medical assistant.  However, the physicians agreed a billing code should not be changed solely in response to a parent complaint and the code should always reflect the medical service actually provided.  Webber's disagreement on the written warning states, "Have checked on procedures of hearing several times and thought they were the same. . . or I would never [have] changed it.  Will not change any in future without performing Dr. okay."

The second billing dispute occurred on or about September 9, 2014, one week prior to Webber's termination.  An established patient's parent received a ten percent credit on her bill at the times of service in March and June 2014, per clinic policy, because she paid with cash, so her account showed a credit.  MKPA did not provide the ten percent discount to patients covered by insurance.  However, the parent was a member of a MediShare not-for-profit Health Care Sharing group, not covered by traditional insurance.  Believing MediShare was insurance, and the parent was asking to convert her cash payment to seek insurance submission, Webber removed the credit from the patient's account, leaving her with an outstanding balance.  Webber removed the credit without first consulting with McKissick or Gilchrist.  The patient became upset and contacted MKPA, threatening to leave the practice as a result of the loss of credit. Webber admitted McKissick instructed her, prior to this event, to include McKissick when making changes to patient accounts, and she had not done so.  However, Webber

believed she was following clinic policy regarding cash payments and did not need prior approval.

**F.      Termination**

In early September 2014, during a workplace conversation whose context is unclear from the record, Webber admits telling McKissick she was "being bitchy." Although McKissick characterizes this as Webber saying, to her face, she had been a "real bitch," Webber testified she did not actually refer to McKissick as a "bitch" but responded, when asked by McKissick how she was feeling, that McKissick had been "bitchy" lately.

On September 16, 2014, Webber went to McKissick's office planning to discuss a HIPAA compliance topic.  After closing her office door, McKissick confronted Webber with complaints she had received that morning from two of Webber's coworkers.  The coworkers complained Webber had confronted them regarding billing errors, which Webber believed was within her scope of duties despite having been instructed to discuss billing issues with her supervisors.  In addition to that morning's complaints, McKissick discussed Webber's removal of a patient's credit without authorization the previous week, and McKissick's belief that Webber was disrespectful toward her, including her recent reference to McKissick as a "bitch" or "bitchy."  McKissick described the meeting as "getting heated," and Webber claimed McKissick was "ranting and raving."

After concluding the meeting, McKissick called Gilchrist to discuss the confrontation.  She described the three topics discussed with Webber, and reported she found Webber to be argumentative and disrespectful during the meeting and Webber

12

refused to acknowledge any fault.  Gilchrist considered the incident to be "just kind of the straw that broke the camel's back" and directed McKissick to terminate Webber's employment on the basis of insubordination if McKissick received approval from a physician.  McKissick received approval from Dr. Crosse, and at the age of 62, Webber's employment with MKPA was terminated.

### G.   Post-Termination

MKPA did not hire anyone for the vacant Billing Leader position immediately following Webber's termination.  The billing duties continued to be performed primarily by Halls.  Eight months after Webber's termination, on May 27, 2015, MKPA hired Michelle Wilson as a part-time receptionist.  Wilson was 48 years old at the time of her hiring.  After the implementation of ICD-10 coding, Wilson was transferred to a part-time billing assistant position.

### H.   This Lawsuit

The parties agree Webber exhausted her administrative remedies on her claims by filing the required charges of discrimination with the Kansas Human Rights Commission and the United States Equal Employment Opportunity Commission.  After receiving a Notice of Right to Sue from the EEOC and a no-probable cause finding from the KHRC, Webber timely filed a Complaint in this Court on September 21, 2015, alleging age and disability discrimination and retaliation.  The parties consented to disposition of the case by the U. S. Magistrate Judge (ECF No. 16).  At the conclusion of discovery, MKPA filed its motion for summary judgment and this matter is now ripe for decision.

## II.      Standards Governing Summary Judgment

As the parties are well aware, Fed. R. Civ. P. 56 requires a court to grant summary judgment if the pleadings, depositions, answers to interrogatories and admissions, stipulations, and any affidavits demonstrate "no *genuine* dispute as to any *material* fact and that the movant is entitled to judgment as a matter of law."[4]

A defendant seeking judgment bears the initial burden to show that genuinely undisputed material facts entitle it to judgment.[5]   It may meet this burden "by pointing out to the court a lack of evidence on an essential element of the nonmovant's claim."[6]   If the defendant makes this prima facie showing, the burden then shifts to the non-moving party to provide evidence of a genuine issue of material fact remaining for trial.[7]   To do so, the plaintiff may not rest on mere allegations or denials, but must set forth specific facts "by reference to affidavits, deposition transcripts, or specific exhibits" from which a rational trier of fact could find for the nonmovant."[8]

The existence of a factual dispute does not prevent an otherwise properly supported motion for summary judgment;[9] "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[10]   Simply put, a factual dispute is "genuine" if the evidence permits

---

[4] Fed. R. Civ. P. 56(a) (emphasis added), (c).
[5] *Vonlintel v. Eagle Commc'ns, Inc.*, No. 14-4125-KHV, 2015 WL 5093271, at *2 (D. Kan. Aug. 28, 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).
[6] *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016) (citing *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007); *Celotex,* 477 U.S. at 323).
[7] *Id*. (citing, among others, *Celotex,* 477 U.S. at 324).
[8] *Id*. (internal citation omitted).
[9] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).
[10] *Sanchez v. Denver Pub. Sch.,* 164 F.3d 527, 531 (10th Cir.1998) (quoting *Anderson,* 477 U.S. at 248).

a reasonable jury to resolve the issue either way.[11]   A fact is "material" when "it is essential to the proper disposition of the claim."[12]   In its review, the court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party.[13]

Summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[14]   When opposing a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[15]

## III.   Analysis

Webber contends MKPA terminated her employment because of her age and disability, and in retaliation for her complaints of discrimination, in violation of:  1) the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*; 2) the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*; 3) the Kansas Act Against Discrimination ("KAAD"), K.S.A. § 44-1001 *et seq.*; and 4) the Kansas Age Discrimination in Employment Act ("KADEA"), K.S.A. § 44-1111 *et seq.* MKPA requests summary judgment on each of Webber's claims, arguing she is unable to make a prima facie showing regarding any of her claims, and even if she can meet her

---

[11] *Apsley v. Boeing Co.*, No. 05-1368-EFM, 2011 WL 1118835, at *3 (D. Kan. Mar. 28, 2011), *aff'd*, 691 F.3d 1184 (10th Cir. 2012) (citing *Haynes v. Level 3 Commc'ns, LLC,* 456 F.3d 1215, 1219 (10th Cir. 2006)).
[12] *Id*. (citing *Haynes*, 456 F.3d at 1219).
[13] *Id*. (citing *LifeWise Master Funding v. Telebank,* 374 F.3d 917, 927 (10th Cir. 2004)).
[14] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).
[15] *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

initial burden, she cannot demonstrate MKPA's reasons for termination were pretext for unlawful discrimination on the basis of age or disability, or retaliation.  The Court first addresses the prima facie showings of each claim in turn.

### A.    Prima Facie Case of Age Discrimination

Both the ADEA and KADEA protect employees over the age of 40 from being terminated or otherwise discriminated against "because of" their age.[16]  An employee is deemed to have been terminated "because of" age when the employee's age is a determining factor in the employer's decision.[17]  "In other words, [the court] must determine whether age was a 'but-for' cause, or 'the factor that made a difference.'"[18]

If a plaintiff is unable to offer direct proof, such as a written policy, of discrimination, indirect or circumstantial evidence of discrimination is considered using the three-part *McDonnell Douglas* burden-shifting analysis.[19]  Here, Webber concedes she presents no direct evidence of discrimination on any of her claims, and the *McDonnell Douglas* analysis applies.   Under this framework, a plaintiff must first demonstrate a prima facie case of discrimination.[20]  If she succeeds in her prima facie

---

[16]  29 U.S.C. §§ 623(a)(1), 631(a); K.S.A. §§ 44-1113(a)(1), -1112(a). Webber claims age discrimination in violation of both the federal ADEA statutes and the state KADEA statutes. Because Kansas courts utilize the ADEA summary judgment burden-shifting framework to analyze state KADEA claims, the Court applies federal law.  *Forbes v. Kinder Morgan, Inc.*, 172 F. Supp. 3d 1182, 1192 n. 8 (D. Kan. Mar. 22, 2016) (citing *Beech Aircraft Corp. v. Kan. Human Rights Comm'n*, 254 Kan. 270, 272–73 (1993); *Bittel v. Pfizer, Inc.*, 307 Fed. App'x 132, 136 n. 3 (10th Cir. 2009)).

[17]  *Greene v. Safeway Stores, Inc.,* 98 F.3d 554, 557 (10th Cir. 1996).

[18]  *Simmons v. Sykes Enterprises, Inc.*, 647 F.3d 943, 947 (10th Cir. 2011) (citing *Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 176 (2009); *Jones v. Okla. City Pub. Sch.,* 617 F.3d 1273, 1277 (10th Cir. 2010)).

[19]  *Id*. (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04 (1973)).

[20]  *Id*. (citing *McDonnell Douglas,* 411 U.S. at 802).

showing, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the termination.[21]  If the defendant does so, the presumption of discrimination drops from the case,[22] and the burden shifts back to the plaintiff, who has the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."[23]

To demonstrate a prima facie case of age discrimination, Webber must establish four elements:  1) she is a member of the protected age group; 2) she was performing satisfactory work; 3) she was terminated or suffered other adverse employment action; and 4) she was either replaced by a younger employee or demonstrates other evidence which provides an inference of discrimination.[24]  Webber's "burden at the prima-facie-case stage is *de minimis*."[25]

MKPA concedes Webber is a member of the protected class and was terminated. However, two elements of Webber's prima facie case remain disputed:  whether she was performing her position satisfactorily, and whether she was replaced by a younger worker or shows other evidence inferring discrimination.

---

[21] *Id.* (citing *McDonnell Douglas,* 411 U.S. at 802-03).

[22] *Jaramillo v. Colorado Jud. Dept.*, 427 F.3d 1303, 1307 (10th Cir. 2005) (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510-11 (1993)).

[23] *Simmons*, 647 F.3d at 947 (citing *McDonnell Douglas*, 411 U.S. at 804).

[24] *See, e.g.*, *Denison v. Swaco Geolograph Co.*, 941 F.2d 1416, 1420 (10th Cir. 1991) (describing the fourth element of the prima facie case as "a younger person replaced [him]"); *but see Maughan v. Alaska Airlines, Inc.* 281 Fed. App'x 803 (10th Cir. 2008) (unpublished) (noting the fourth element is whether a plaintiff was "terminated under circumstances giving rise to an inference of unlawful age discrimination").

[25] *Maughan*, 281 F. App'x at 806 (citing *Plotke v. White,* 405 F.3d 1092, 1101 (10th Cir. 2005)).

### 1.      Quality of Performance

MKPA claims Webber's job performance was unsatisfactory, and provided testimony claiming MKPA considered performance-based termination of Webber, prior to her illness, because of the strained relationships she caused in the MKPA work environment.  Webber disagrees, citing her promotion in 2008, her consistent pay raises and bonuses, her positive reviews, and the absence of formal discipline.  She received only two documented warnings in her nearly seven years of employment—one of which occurred after her illness.  Webber's last performance review was January 7, 2014, shortly before her cancer diagnosis.  As a result of the review, she received a pay increase, and she described Gilchrist's statements regarding the positive performance of the billing department, which consisted solely of Webber and Halls.  Webber accepted the wage increase as proof of her sufficient performance.

To establish her work was satisfactory, the Tenth Circuit Court of Appeals in *MacDonald v. E. Wyoming Mental Health Center*[26] noted a plaintiff must simply produce "credible evidence that she continued to possess the objective qualifications she held when she was hired, or by her own testimony that her work was satisfactory even when disputed by her employer, or by evidence that she held her position for a significant period of time."[27]  Although MKPA produced evidence regarding Webber's disruptive conduct and two problematic billing incidents, the Court finds these reasons provided for her discharge are more appropriately addressed at the pretext stage rather than in

---

[26]  941 F.2d 1115 (10th Cir. 1991).
[27] *Id.* at 1121 (abrogated on other grounds) (internal citations omitted).

Webber's prima facie case.[28] As the Tenth Circuit discussed in *Denison v. Swaco Geolograph Co.*,[29] Webber's burden is one of production only, and MKPA's arguments regarding its reasons for her termination go "to the *weight* of the evidence of satisfactory performance, not [plaintiff]'s initial burden" of *production*.[30] Because Webber produced evidence of all three types suggested in *MacDonald*,[31] the Court finds she has satisfied her burden of production on this prima facie element.

## 2. Other Evidence of Age Discrimination

The final disputed element of Webber's prima facie case of age discrimination is whether she was replaced by a younger person or has produced other evidence giving rise to discrimination. Most often this fourth element is simply articulated as whether the plaintiff was replaced by younger worker;[32] occasionally this element is interpreted to include any other evidence which gives rise to discrimination.[33] But "the fourth element of a prima facie case is a flexible one that can be satisfied differently in varying scenarios."[34] The Tenth Circuit has repeatedly described the elements of the prima facie

---

[28] *Id.* (addressing the defendant's reasons for discharge at the pretext stage rather than in determining the existence of a prima facie case) (citing *Merrick v. N. Nat. Gas Co., Div. of Enron Corp.*, 911 F.2d 426, 430 (10th Cir. 1990); *Lucas v. Dover Corp., Norris Div.*, 857 F.2d 1397, 1401 n. 8 (10th Cir. 1988)).

[29] 941 F.2d at 1420-21.

[30] *Id.* at 1420 (emphasis added).

[31] *See supra* text accompanying note 27.

[32] *See, e.g.*, *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1146 (10th Cir. 2008) (referring to fourth element as "replaced by a younger persion, although not necessarily one less than 40 years of age").

[33] *See, e.g., Maughan.* 281 Fed. App'x 803 (10th Cir. 2008) (unpublished) (noting the fourth element is whether a plaintiff was "terminated under circumstances giving rise to an inference of unlawful age discrimination").

[34] *Barnes v. Foot Locker Retail, Inc.*, No. 06-2118-JWL, 476 F. Supp. 2d 1210, 1213–14 (D. Kan. 2007) (citing *Plotke*, 405 F.3d at 1099-1101).

showing under *McDonnell Douglas* as "neither rigid nor mechanistic" to suit the ultimate purpose: "the establishment of an initial inference of unlawful discrimination warranting a presumption"[35] of discrimination.

Webber contends two younger workers eventually took over her entire billing duties.  First, during her illness and subsequent return to work, her duties were shifted to Halls, who was almost 30 years Webber's junior.  Then, months later, Wilson—15 years younger than Webber—was hired and soon transferred to billing.  Although MKPA denies the two women were technical replacements for Webber, it does not dispute the younger employees ultimately took on the duties she formerly performed.  Additionally, Webber testified McKissick made repeated comments regarding Webber's retirement plans.  Although MKPA denies inquiries regarding retirement plans are in and of themselves evidence of discrimination, to satisfy her *de minimis* prima facie burden, Webber must only *produce* evidence that she was terminated "under circumstances which give rise to an inference of discrimination."[36]  Because Webber's burden is simply one of production at this stage, and viewing all inferences from these facts in the light most favorable to Webber, the Court concludes she meets the *de minimis* showing required for a prima facie case of age discrimination.

---

[35] *Adamson*, 514 F.3d at 1146 (citing cases).
[36] *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005) (citing *Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1227 (10th Cir. 2000).

### B.    Prima Facie Case of Disability Discrimination

Both the ADA and the KAAD prohibit an employer from terminating an employee "because of" the employee's disability or perceived disability.[37]   Like Webber's age claim, her disability claim is also analyzed using the *McDonnell Douglas* burden-shifting framework.[38]   To succeed, Webber must first demonstrate through her prima facie case: "1) she is a disabled person as defined by the ADA; 2) she is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and 3) her employer discriminated against her because of her disability."[39]   MKPA concedes Webber was disabled as defined by the ADA; however, the remaining two elements of the prima facie case remain disputed.

### 1.    Quality of Performance

Webber makes the same arguments regarding her qualifications to perform her position as with her age discrimination claim—she relies upon her length of employment, regular wage increases and bonuses, and the general lack of documented discipline to maintain she was qualified to perform her job.   Again, MKPA's primary argument is Webber's inability to maintain positive working relationships and her disruptive effect on the work environment.

---

[37] 42 U.S.C. § 12112(a); K.S.A. § 44-1009(a)(1).   Webber claims disability discrimination in violation of both the federal ADA statutes and the state KAAD statutes.   Because Kansas courts utilize the ADA summary judgment burden-shifting framework to analyze state KAAD claims the Court applies federal law. *See Reed v. Nellcor Puritan Bennett*, 244 F. Supp. 2d 1205, 1213 (D. Kan. 2003) (citing *Aramburu v. Boeing Co.,* 112 F.3d 1398, 1403 n. 3 (10th Cir. 1997); *Woods v. Midwest Conveyor Co.,* 231 Kan. 763, 766, 648 P.2d 234, 238–39 (1982)).
[38] *MacKenzie v. City & Cty. of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005).
[39] *Id.*

As discussed above in the analysis of Webber's age claim, MKPA's reasons provided for her discharge are better addressed in the pretext phase rather than in Webber's prima facie case.[40] Webber produced some evidence of long-term satisfactory performance which did not appear to change in any significant respect following her illness, and her burden at this stage is not only *de minimis*, but is one of production, not of persuasion.[41]  Reviewing the evidence in the light most favorable to Webber, the Court finds she meets her minimal burden.

### 2.      Evidence Giving Rise to an Inference of Discrimination

Webber recites multiple facts which she contends, taken together, provide an inference of disability discrimination.  She cites McKissick's disputed mention of "chemobrain;" the admitted changes to her job duties following her illness; McKissick's repeated questions regarding Webber's retirement plans; and the idea that Halls and Wilson were not disabled when they assumed the billing duties.  Although Webber's burden here is "not onerous,"[42] this element is a closer call.  The immediate restructuring of Webber's job duties during her part-time work—after her surgery and during her treatment—is just as easily viewed as accommodation to her in consideration of her illness, yet MKPA failed to restore her previous duties upon her return to full-time work. Webber asserts the two workers who ultimately took over her duties are not disabled, but she produced no evidence to support the allegation.  Without deciding, the Court assumes

---

[40] *Id.* at 1121 (citing *Merrick*, 911 F.2d at 430; *Lucas v. Dover Corp., Norris Div.,* 857 F.2d 1397, 1401 n. 8 (10th Cir.1988)).

[41] *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005).

[42] *Id.* (citing *McCowan v. All Star Maint., Inc.,* 273 F.3d 917, 922 (10th Cir.2001)).

Webber has met her *de minimis* burden to establish a prima facie case of disability discrimination and will ultimately decide her case on the issue of pretext.

### C.   Prima Facie Case of Retaliation

Like her age and disability discrimination claims, Webber's retaliation claims are also analyzed using the *McDonnell Douglas* framework.[43]  To meet her initial burden to demonstrate a prima facie claim of retaliation under either the ADEA[44] or ADA,[45] Webber must show:  1) she engaged in protected opposition to discrimination; 2) she was adversely affected by an employment decision; and 3) a causal connection existed between the protected activity and the adverse action.[46]  The parties stipulate Webber was adversely affected by her termination; therefore two elements remain disputed.[47]

### 1.   Protected Opposition to Discrimination

MKPA first argues Webber did not engage in protected activity.  Webber's claim of retaliation stems from the June 3, 2014 meeting with Gilchrist, where she alleges she engaged in protected activity by "opposing unlawful employment practices taken against her." (ECF No. 31, at 9 ¶ 23.)  During that meeting, Gilchrist confronted Webber about

---

[43] *See Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 638 (10th Cir. 2012) (assessing plaintiff's retaliation claims under the *McDonnell Douglas* framework) (citing *McDonnell Douglas*, 411 U.S. at 802–04).

[44] 29 U.S.C. § 623 (d).

[45] 42 U.S.C. § 12203(a).

[46] *Daniels*, 701 F.3d at 638; *MacKenzie*, 414 F.3d at 1278–79.

[47] Defendant initially argues Webber abandoned her claim of retaliation based upon the June 3, 2014 meeting because she failed to include it in her response to Defendant's contention interrogatory (see ECF No. 33 at 37-38).  However, Webber has been consistent in her assertion of the meeting as a basis for her retaliation claim, and the Court takes counsel at his word that the interrogatory response was in error due to misreading of the question. (ECF No. 39 at 37.)  The Court chooses to examine Webber's retaliation claim on its merits.

rumors of multiple complaints Webber made to coworkers, including claims that: MKPA was mistreating her; it was planning to fire her because of an expected increase in health insurance premiums; it was taking away her job duties; the "chemobrain" comment; and Webber was compiling evidence for a future discrimination claim.

Because Webber did not make a specific complaint of discrimination—age or disability related—during the meeting, MKPA maintains she fails to demonstrate the first prong of the prima facie analysis. But MKPA places a higher burden than necessary on Webber at this point. The Court does not examine "whether plaintiff made a *formal* accusation of discrimination but whether her communication sufficiently conveyed a reasonable concern that [the employer] had acted or was acting in an unlawful discriminatory manner."[48] There is no question Webber either made complaints to her supervisor in the June 3, 2014 meeting, or that her previous complaints to coworkers had been relayed to her supervisor—that was, after all, the purpose of the meeting. Webber is correct her complaints to coworkers which were then passed on to her supervisors can constitute protected activity.[49]

But despite her general complaints regarding her treatment, Webber's prima facie case of retaliation based on complaints of age discrimination fails. Webber has produced no evidence she made even an informal complaint of age discrimination to her coworkers or supervisors. The evidence from both parties, including Gilchrist's email to the physician partners and Webber's own testimony, reflects Webber complained in the June

---

[48] *Creason v. Seaboard Corp.*, 263 F. Supp. 2d 1297, 1312 (D. Kan. 2003) (emphasis added).

[49] *See Mondaine v. Am. Drug Stores, Inc.,* 408 F. Supp. 2d 1169, 1190 (D. Kan. 2006) (citing *Zowayyed v. Lowen Co*., 735 F. Supp. 1497, 1504 (1990); *Neiderlander v. Am. Video Glass Co*., 80 Fed. App'x 256, 261 (3d Cir. 2003)).

2014 meeting she was being mistreated due to her illness, including the "chemobrain" incident and the discussion of health insurance premiums.  Webber's own testimony was that she was "frightened . . . [she] was going to lose [her] job because [she] wasn't being put back to work *the way it was before [she] was sick*."[50]  Even when viewing the facts in the light most favorable to Webber, no evidence was produced which demonstrates Webber complained to anyone regarding her age prior to her termination. Although "no magic words are required,"[51] general complaints or vague references to mistreatment "without any indication that this misconduct was motivated by [age] does not constitute protected activity and will not support a retaliation claim."[52]  Finding she did not engage in protected opposition to age discrimination, Webber's retaliation claim based on age discrimination fails.

However, in the June 3, 2014 meeting with Gilchrist, Webber clearly relayed her concerns—either directly to Gilchrist, or the concerns had reached Gilchrist through other employees—about changes to Webber's job occurring since her illness.  Because she is not required to specifically claim disability discrimination, and viewing the record in the light most favorable to Webber, the Court finds she engaged in protected opposition to disability discrimination and continues its analysis of retaliation based on her complaints of treatment related to her disability.

---

[50] Webber Dep. 67:25, 68:1-2 (Apr. 5, 2016), ECF No. 39-3 (emphasis added).
[51] *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008) (internal citations omitted).
[52] *Anderson v. Acad. Sch. Dist. 20,* 122 Fed. App'x 912, 916 (10th Cir. 2004).

### 2.    Causal Connection Between Termination and Disability Claim

The remaining analysis of Webber's prima facie retaliation case is whether she demonstrated a causal connection between her complaints of disability discrimination and her termination.  Webber must establish this causal connection by presenting "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."[53]

Webber's termination followed more than three months after her protected complaints.  The Tenth Circuit has repeatedly found,

> Unless an adverse action is *very closely* connected in time to the protected activity, a plaintiff must rely on additional evidence beyond mere temporal proximity to establish causation. A six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation, but a three-month period, standing alone, is insufficient.[54]

If temporal proximity were Webber's sole demonstration of causation, her retaliation claim would fail.  But to bolster her claim in light of the temporal distance between her June complaints and September discharge, Webber presents additional evidence she believes is indicative of a retaliatory motive, including: McKissick's mention of "chemobrain;" the refusal to restore Webber's pre-illness job duties; McKissick's inquiries regarding Webber's retirement plans; and Gilchrist's ill-advised email to the board insinuating she was going to restructure and felt she could put Webber in the corner with a coloring book.

---

[53] *MacKenzie*, 414 F.3d at 1278–79 (internal citations omitted).
[54] *Id*. at 1280 (citing *Meiners v. Univ. of Kan.,* 359 F.3d 1222, 1231 (10th Cir. 2004) (quotation omitted) (emphasis in original).

However, the initial changes to Webber's position, and the chemobrain and retirement comments, all occurred (at least in part) prior to the June meeting—providing no additional inference of causation.  But the failure to restore Webber's pre-illness duties after she returned to full-time work after the June meeting, and after Gilchrist's comment regarding restructuring, may together be further evidence of retaliatory animus. Because Webber has produced *some* additional evidence, as required,[55] this is a close call.  Because MKPA's motion is ultimately determined on the issue of pretext, the Court will simply presume, without deciding, that Webber meets her prima facie case of retaliation based on disability discrimination.[56]

### D.    <u>Pretext</u>

Once Webber satisfies her duty to present her prima facie claims, the burden shifts to MKPA to establish a legitimate, non-discriminatory reason for her discharge.[57] Webber concedes MKPA articulated a legitimate and nondiscriminatory reason for the termination of her employment – a series of incidents MKPA viewed collectively as insubordination – and therefore satisfied its burden under the second prong of the *McDonnell Douglas* analysis.  Because MKPA demonstrated a valid reason for Webber's

---

[55] *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1191 (10th Cir. 2016) (noting "where a considerable length of time has elapsed between a protected activity and an adverse employment action, a plaintiff wishing to survive summary judgment must present additional evidence tying the adverse employment actions to the plaintiff's protected activity.") (internal quotes and citations omitted).

[56] *See Hardy v. S.F. Phosphates Co.*, 185 F.3d 1076, 1080 (10th Cir. 1999) (where both the district court and the Circuit assumed, without deciding, that plaintiff made a prima facie showing of discrimination, and moved forward to the pretext analysis); *see also Heslet v. Westar Energy, Inc.*, No. 03-4144-JAR, 2005 WL 752147, at *6 (D. Kan. Mar. 29, 2005), *aff'd*, 174 F. App'x 434 (10th Cir. 2006) (discussing cases where, in part, the court assumed plaintiff had established a prima facie case of discrimination without deciding the issue).

[57] *Simmons*, 647 F.3d at 947 (citing *McDonnell Douglas,* 411 U.S. at 802-03).

termination, "the presumption of discrimination established by the prima facie showing simply drops out of the picture."[58]  Webber then "carries the full burden of persuasion" to demonstrate MKPA discriminated on the illegal bases of age and disability, and retaliated against Webber, by showing that MKPA's proffered reason for the termination is pretextual.[59]   Webber must demonstrate "by a preponderance of evidence that the legitimate reasons offered by defendant were not its true reasons."[60]

To determine pretext, the Court examines "whether the employer's stated reasons were held in good faith at the time of the discharge, even if they later prove to be untrue, or whether plaintiff can show that the employer's explanation was so weak, implausible, inconsistent or incoherent that a reasonable fact finder could conclude that it was not an honestly held belief but rather was subterfuge for discrimination."[61]  The Court reviews the "facts as they appear to the person making the decision to terminate."[62]

Webber submits three primary arguments why MKPA's reason for terminating her was pretextual:  1) the evidence shows a genuine issue of fact regarding the truth of the allegations; 2) the evidence shows MKPA acted contrary to its own policies and practices; and 3) other facts which demonstrate pretext.

---

[58] *Barnes*, 476 F. Supp. 2d at 1213 (citing *Bryant v. Farmers Ins. Exchange,* 432 F.3d 1114, 1124 (10th Cir. 2005)).
[59] *Id*. (citing *Bryant,* 432 F.3d at 1124-25).
[60] *Reeves v. Sanderson Plumbing Prod., Inc*., 530 U.S. 133, 135 (2000).
[61] *Simmons*, 647 F.3d at 947–48 (citing *Young v. Dillon Cos., Inc.,* 468 F.3d 1243, 1250 (10th Cir. 2006).
[62] *Id*. (citing *Kendrick,* 220 F.3d at 1231).

### 1.    Veracity of MKPA's Reasoning

Webber contends MKPA's reason for terminating her is false, or at minimum presents questions of material fact to be decided by a jury.   But Webber analyzes MKPA's reasoning from the incorrect viewpoint.   Although the parties disagree on the characterization of the underlying incidents upon which MKPA based its termination decision, Webber's subjective understanding is not the lens through which the Court must examine the events.   Webber incorrectly focuses on the underlying truth, when in fact the focus is not whether the information provided to the decision maker was objectively true, but whether the decision maker *believed* it to be true.   The Court must "examine the facts as they appear to the person making the decision, not the plaintiff's subjective evaluation of the situation."[63]

Although Webber denies confronting her coworkers in a negative manner, but believes she merely asked them billing questions in the regular course of her work, the sworn statements of her coworkers tell a different story.   Likewise, although Webber disputes she called McKissick a "real bitch," she *admits* to referring to McKissick's attitude as "bitchy."   While Webber denies rescinding a patient's discount and depicts the billing incident as discount forfeiture and within her scope of work—these differences in characterization do not preclude judgment.   Despite Webber's subjective belief MKPA's reasoning was false, mere allegations are not enough to prove falsity.[64]   "To raise an

---

[63] *Robinson*, 645 F. App'x at 648 (citing *Jaramillo,* 427 F.3d at 1309) (internal quotations omitted).

[64] *Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1267 (10th Cir. 2007) ("Even though all doubts concerning pretext must be resolved in plaintiff's favor, a plaintiff's allegations alone will

inference of pretext in the face of the employer's legitimate, nondiscriminatory explanation, the plaintiff must undermine the employer's credibility to the point that a reasonable jury *could not find in its favor*."[65]  Here, Webber has not done so.

### 2.  MKPA's Actions in Relation to Its Policies

Webber claims MKPA acted contrary to its own policies by terminating her, rather than engaging in progressive discipline—first warning, then suspension, then dismissal—as suggested on MKPA's Employee Warning Report forms.  In Webber's 2011 Employee Warning Report, warning her on her interactions with coworkers, the form indicated a failure to improve would result in suspension.  Because, three years later, MKPA terminated her without any interceding suspension, Webber contends this is evidence of pretext.

Aside from the Employee Warning form, Webber presented no evidence of a written policy or practice by MKPA to follow some established protocol of progressive discipline.  And despite a lack of interceding written warnings, Webber does not deny she was verbally approached regarding her interactions with coworkers, and therefore aware of her employer's expectations.[66]  In light of these facts, and in the absence of an established policy, the Court cannot find MKPA's failure to suspend Webber, rather than

---

not defeat summary judgment.") (citing *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1324 (10th Cir. 1997)).

[65] *Jaramillo*, 427 F.3d at 1310 (emphasis added).

[66] *See, e.g.*, *Merritt v. Tellabs Operations, Inc.*, 222 F. App'x 679, 684 (10th Cir. 2007) (discussing the employer's lack of obligation to follow the employee policy in every case, and noting plaintiff was given notice of the employer's expectations and opportunities to improve, even though the employer chose not to employ formal progressive discipline).

terminate her, constitutes the "disturbing procedural irregularity"[67] which would amount to pretext.

### 3.   Other Facts

To further support her claim of pretext, Webber summarily lists a number of facts which she believes shows MKPA's reason for her termination is not believable, without any legal analysis regarding why those facts create a genuine issue precluding judgment. But this recitation of facts misses the mark—they relate to instances Webber believes indicate discriminatory animus, but none of the instances specifically refute MKPA's legitimate reason for terminating her employment.

Somewhat analogous was the situation recently before the Tenth Circuit in *Robinson v. St. John Medical Center*.[68]   In *Robinson*, the plaintiff employee, a nurse, did not dispute she engaged in the conduct which led to physician's complaints, but disagreed with the employer's "business judgment that her actions were outside the scope of her position."[69]   Noting this, the court found she failed to demonstrate pretext.

Here, Webber does not dispute she engaged in multiple instances of conduct which eventually culminated the in the meeting between Webber and McKissick on September 16, 2014.   Regarding her relationships with coworkers, she provides no rebuttal for the affidavits from eight coworkers outlining Webber's effects on the work

---

[67] *Forbes*, 172 F. Supp. 3d at 1193, 1196 (citing *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1122 (10th Cir. 2007).  *See also Merritt,* 222 F. App'x at 684; *Robinson,* 645 Fed. App'x at 650 (10th Cir. 2016) (unpublished) (citing *Riggs v. AirTran Airways, Inc.,* 497 F.3d 1108, 1119 (10th Cir. 2007)).

[68] 645 Fed. App'x 644 (10th Cir. 2016) (unpublished).

[69] *Id*. at 650.

environment, allowing the Court to consider her negative influence on the workplace undisputed.[70]  She did not controvert evidence she referred to her coworkers and clinic physicians as "idiots" on occasion.[71]  She admitted to telling McKissick she was "bitchy," and whether or not McKissick was truly her supervisor, it is uncontroverted that by the time Webber made this comment, she believed McKissick to be her supervisor. Despite Webber's lack of intention to be disobedient or insubordinate, she does not deny MKPA's claims.

Webber's beliefs regarding the two 2014 billing issues fare no better at challenging MKPA's reason for her termination.   Despite her reported confusion regarding the proper code, Webber admits to changing the hearing test bill in April 2014 without the provider or Gilchrist's prior approval.  Intent aside, the code was changed to a service which was not actually performed.  Likewise, although Webber believed she had authority to remove a patient's credit in September 2014, the evidence presented shows she rescinded the credit without first consulting her supervisors.  Webber neither disputes she took these actions, nor presents evidence suggesting MKPA did not honestly believe she acted outside the scope of her position.  Webber's subjective belief that her actions were within her job duties is, again, insufficient to present "such a disturbing

---

[70] Fed. R. Civ. P. 56(e)(2).  *See, e.g., Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 160–61 (1970) (citing Fed. R. Civ. P. 56(e); noting if defendant met its initial burden by submitting affidavits from policemen denying their presence in the store, Rule 56(e) requires plaintiff to do more than rely on contrary allegations, but must come forward with the affidavit of someone who saw the policemen in the store or explain why it was impractical to do so).

[71] Def.'s Mem. (ECF No. 33), at 12 ¶29; Pl.'s Resp. (ECF No. 39) at 20 ¶29 ("Uncontroverted").

procedural irregularity" to show MKPA's reason for terminating her—insubordination—was pretext for discrimination or retaliation.[72]

Webber contends, without elucidating, that the facts she lists are "compounded by additional facts asserted by MKPA" in its motion. She then cites to her own factual statements without explaining why they support an inference of pretext. Although she may rely on facts used to support her prima facie case to support her claim of pretext, she fails to demonstrate how those facts should lead to an inference that MKPA did not honestly believe its reason for terminating her.

In large part, Webber takes issue with MKPA's stated reason for terminating her and claims MKPA altered its reasoning from "insubordination" at termination to include other reasons in its summary judgment motion. It is true that when an employer changes its justification for termination, this could infer pretext.[73] But here, MKPA did not change its reasons. The parties agree McKissick discussed three specific topics with Webber in their final meeting, which led to Gilchrist's decision to terminate Webber for insubordination. However, this conversation and general description of Webber's insubordination must not be considered in isolation. In fact, Gilchrist described Webber's defiance, disrespect and rudeness toward McKissick in their final meeting as the "last straw" in a history of incidents with Webber.[74]

The Court finds this explanation is not only consistent, but supported in the record. As discussed above, Webber fails to controvert MKPA's evidence of her disruptive and

---

[72] *Robinson*, 645 Fed. App'x at 650 (citing *Riggs*, 497 F.3d at 1119).
[73] *Jaramillo*, 427 F.3d at 1309-10.
[74] Gilchrist Decl., ECF No. 33, Ex.1 at ¶¶ 15, 17.

disrespectful behavior. The evidence submitted by MKPA is sufficient to support Gilchrist's good faith belief that Webber was insubordinate, and does not prove "inconsistencies" in defendant's cited reasons for termination. Even if Gilchrist's articulated reason was not all-encompassing, it is not "converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment."[75]

In sum, MKPA's reason for terminating Webber's employment was not implausible. MKPA provided evidence of Webber's undesirable behavior which was, in part, admitted by Webber and rebutted only by her subjective beliefs. Her admissions and allegations do not meet her burden to show, by a preponderance of evidence, that MKPA's reason for her termination was pretext. Webber submitted no evidence which shows a genuine issue of material fact to whether MKPA did not honestly believe she had been repeatedly and consistently insubordinate. Although by all accounts, it appears Webber was more than capable of handling MKPA's billing—and had been, for years— she clearly did not work well with others. Her disruption to the work environment was present prior to her unfortunate illness and remained afterward, and was ultimately the reason for her demise with MKPA. Because MKPA's reasons for her termination were not implausible, inconsistent, or incoherent,[76] Webber fails to demonstrate pretext for age or disability discrimination or retaliation based on her complaints of disability discrimination.

---

[75] *Rivera v. City & Cty. of Denver*, 365 F.3d 912, 924–25 (10th Cir. 2004) (citing *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998); *Tran v. Trs. of State Colls. in Colo.*, 355 F.3d 1263, 1268–69 (10th Cir. 2004) (employer's good faith belief "would not be pretextual even if the belief was later found to be erroneous") (internal quotation marks omitted)).

[76] *See Simmons*, 647 F.3d at 947–48.

**IV.    Conclusion**

Because Webber has not provided sufficient evidence to create a genuine issue of material fact regarding whether MKPA's reason for her termination was pretext for illegal discrimination on the basis of age or disability, or retaliation, the Court grants MKPA's motion for summary judgment in its entirety.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (**ECF No. 32**) is **GRANTED**.

**IT IS SO ORDERED**.

Dated at Wichita, Kansas this 17th day of November 2016.

 s/ Gwynne E. Birzer
GWYNNE E. BIRZER
United States Magistrate Judge